FILED

02 JUL 30  AM 10: 2'

U.S. DISTRICT COURT
N.D OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

ALABAMA-TOMBIGBEE RIVERS )
COALITION; PARKER TOWING )
COMPANY, INC.; CHARLES A. HAUN, )
)
     **Plaintiffs,** )
)
vs. )      **Civil Action No.  CV-01-S-0194-S**
)
GALE NORTON, Secretary of the United )
States Department of the Interior; STEVE )
WILLIAMS, Director of the United States )
Fish and Wildlife Service; SAM )
HAMILTON, Regional Director of the )
United States Fish and Wildlife Service; )
UNITED STATES DEPARTMENT OF )
THE INTERIOR; UNITED STATES )
FISH AND WILDLIFE SERVICE, )
)
     **Defendants.** )

ENTERED

JUL 3 0 2002

## MEMORANDUM OPINION

     Plaintiffs — the Alabama-Tombigbee Rivers Coalition, a non-profit Alabama corporation;

Parker Towing Company, Inc., an Alabama corporation and a member of the Alabama-Tombigbee

Rivers Coalition; and Charles A. Haun, an individual — have sued defendants — Gale Norton,

Secretary of the United States Department of the Interior; Steve Williams, Director of the United

States Fish and Wildlife Service ("FWS"); Sam Hamilton, Regional Director of the FWS; the United

States Department of the Interior; and the FWS — alleging violations of the Endangered Species Act

and the Administrative Procedures Act arising from the listing of the Alabama sturgeon as an

endangered species.[1]  Plaintiffs ask this court to declare that the final rule listing the Alabama

---

[1]Doc. no. 1.

sturgeon as an endangered species  is "unlawful and  void of any force and effect"[2] for numerous

alleged errors or omissions in the rule-making process.

This action now is before the court on plaintiffs' and defendants' cross motions for summary

judgment.[3] Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only

is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(c).  Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.

2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all
> reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment
> unless that factual dispute is material to an issue affecting the outcome of the case.
> The relevant rules of substantive law dictate the materiality of a disputed fact.  A
> genuine issue of material fact does not exist unless there is sufficient evidence
> favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City*

*of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted); *see*

*also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

---

[2]*Id.* at 10, 11, 13, 21, 22,  26, 29, 31.

[3]Doc. nos. 44 and 49, respectively.

Upon consideration of the pleadings, evidentiary submissions, and briefs, this court concludes that defendants' motion for summary judgment is due to be granted, and plaintiffs' motion for summary judgment denied, because plaintiffs do not possess Article III standing.[4]  Discussion of the merits of plaintiffs' claims is pretermitted.[5]

## I. ENDANGERED SPECIES ACT, 16 U.S.C. § 1531 *et seq.*

The Endangered Species Act ("ESA") is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180, 98 S. Ct. 2279, 2294, 57 L. Ed. 2d 117 (1978).  "[E]xamination of the language, history, and structure of the legislation under review here indicates *beyond doubt* that Congress intended endangered species to be afforded the highest of priorities." *Id.* at 174, 98 S. Ct. at 2292 (emphasis in original).

> The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute. All persons, including federal agencies, are specifically instructed not to "take" endangered species, meaning that no one is "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" such life forms. 16 U.S.C. §§ 1532(14), 1538(a)(1)(B) (1976 ed.). Agencies in particular are directed by §§ 2(c) and 3(2) of the Act to "use . . . *all methods* and procedures which are necessary" to preserve endangered species. 16 U.S.C. §§ 1531(c), 1532(2) (emphasis added) (1976 ed.). In addition, the legislative history undergirding § 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species. The pointed omission of the type of qualifying language previously included in

---

[4]"Article III, § 2 of the Constitution extends the "judicial Power" of the United States to actual "Cases" and "Controversies."  A lawsuit does not fall within this grant of judicial authority unless, among other things, courts have the power to "redress" the "injury" that the defendant allegedly "caused" the plaintiff. *Utah v. Evans*, 122 S. Ct. 2191, 2197 (2002).  "Standing" is a jurisdictional doctrine. *United States v. Hayes*, 515 U.S. 737, 742, 115 S. Ct. 2431, 2435, 132 L. Ed. 2d 635 (1995).

[5]"Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94, 118 S. Ct. 1003, 1012, 140 L. Ed. 2d 210 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514, 19 L. Ed. 264 (1868)).

endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the "primary missions" of federal agencies.

*Id.* at 184-85, 98 S. Ct. at 2297.

The listing process is the "keystone" of the ESA. H.R. No. 97-567, 97th Cong. 2d Sess. 10 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2810. Once a species is listed, statutory prohibitions help ensure the survival and recovery of the species. *See, e.g.,* 16 U.S.C. § 1536 ["Section 7"] (federal agencies' duty to avoid jeopardizing listed species); 16 U.S.C. § 1538 ["Section 9"] (prohibitions against taking of listed species).

The ESA authorizes the Secretary of the Interior to list a species as "threatened" or "endangered."[6] 16 U.S.C. § 1533(a). The listing of a species may occur in one of two ways: either through a "petition process," or a "candidate process." *See Center for Biological Diversity v. Norton*, 254 F.3d 833, 834 (9th Cir. 2001). Under the "candidate process," the FWS designates a species as a candidate species, if review of the species's biological status demonstrates that the FWS has on file sufficient information of biological vulnerability and threat(s) to support the issuance of a proposed rule. *Id.* at 835. Under the "petition process," any "interested person" may petition the Secretary to add a species to the list of endangered or threatened species. 16 U.S.C. § 1533(c)(3). The Alabama sturgeon was listed through the candidate process. 65 Fed. Reg. 26441.

Pursuant to § 4(a)(1) of the ESA, the Secretary must list a species that she determines to be threatened or endangered because of one or more of the following five factors:

    (A)    the present or threatened destruction, modification, or curtailment of its habitat or range;

---

[6] A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532 (20). An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range ." *Id.* (6).

(B)     overutilization for commercial, recreational, scientific, or educational purposes;

(C)     disease or predation;

(D)     the inadequacy of existing regulatory mechanisms; or

(E)     other natural or manmade factors affecting its continued existence.

16 U.S.C. §1533(a)(1). The Secretary must make her decision whether to list a species "solely on the basis of the best scientific and commercial data available to him [or her] after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species . . . ." 16 U.S.C. § 1533(b)(1)(A).

Listing of a species, whether through the petition process or the candidate process, is done through notice and comment rule-making. 16 U.S.C. § 1533(b)(4). If the Secretary determines that the listing is warranted, she must publish a notice in the Federal Register that includes the complete text of the proposed rule to implement the action. 16 U.S.C. § 1533(b)(3)(B)(ii). The Secretary must act on the proposed rule within one year of the date of its publication. 16 U.S.C. § 1533(b)(6)(A). At that point, she may: promulgate a final rule listing the species; withdraw the proposed rule, if she finds that there is not sufficient evidence to justify the proposed rule; or extend the one-year period by not more than six months, if she finds that there is "substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned." §1533(b)(6)(B)(i). If the Secretary pursues the latter option, she must take final action on the petition by the end of the six-month extension period. *Id.*

The ESA provides a number of opportunities for the public to furnish information to the Secretary and comment upon proposed rules prior to publication of a final rule. Once a proposed rule has been published in the Federal Register, the Secretary must provide at least sixty days for all interested parties to comment on the proposed rule and provide any relevant information to the Secretary. 50 C.F.R. § 424.16. In addition, notification of the proposed rule must be published in a newspaper of general circulation in the areas where the species occurs. *Id.* The Secretary must hold at least one public hearing if any person so requests within forty-five days of the proposed rule's publication. *Id.*; 16 U.S.C. § 1533(b)(5)(E).

If a species is listed as endangered, the species is then afforded certain legal protections. For example, Section 9 of the ESA prohibits any illegal or unauthorized "taking" of an endangered species. 16 U.S.C. § 1538(a)(1). The ESA defines the meaning of "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19); *see also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 697-701, 115 S. Ct. 2407, 2413-14, 132 L. Ed. 2d 597 (1995) (finding reasonable Secretary's interpretation of the word "harm," as used in the ESA, to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering") (citing 50 C.F.R. § 17.3).

In addition, Section 7 of the ESA requires each Federal agency to ensure that any action authorized, funded, or carried out by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). "Every agency is required to verify that its

-6-

actions will not jeopardize any . . . listed species by consulting with, and obtaining the assistance of, the Secretary of Interior, acting through the Fish and Wildlife Service," if the listed species lives on land, and through the National Marine Fisheries Service (NMFS), if the listed species lives in water. *Sierra Club v. U.S. Army Corps of Engineers*, No. 01-11179, 2002 WL 1368765, at *1 & n.2 (11th Cir. Jun 25, 2002).

Once a species is listed, the Secretary may review its status at any time based upon a petition or upon other available data. 50 C.F.R. § 421.21. In addition, any interested person may submit a petition to delist or reclassify a species. 16 U.S.C. §§ 1533(b)(3)(A).

## II. SUMMARY OF FACTS

"The Alabama sturgeon (*Scaphirhynchus suttkusi*) is [a] small, freshwater sturgeon that was historically found only in the Mobile River Basin of Alabama and Mississippi." 65 Fed. Reg. 26438 (2000). Plaintiffs assert that scientific evidence demonstrates that the Alabama sturgeon and the shovelnose sturgeon, found in the Mississippi River Basin, are the same species,[7] but the FWS found that the two fish are different species. 65 Fed. Reg. 26439. "Characters used to distinguish the Alabama sturgeon from the [Mississippi] shovelnose sturgeon (*Scaphirhynchus platorynchus)* include larger eyes, orange color, number of dorsal plates, dorsal fin ray numbers, and the absence of spines on the tip of the snout and in front of its eyes." *Id.* at 26438.

At one time, the Alabama sturgeon's range included about 1,000 miles of the Mobile River system in Alabama, including the Black Warrior, Tombigbee, Alabama, Coosa, Tallapoosa, Mobile, Tensaw, and Cahaba Rivers. *Id.* at 26439. It was so common during the late 1800's and the early 1900's that it was captured commercially. *Id.* On the date of its listing as an endangered species,

---

[7]Doc. no. 45, p. 68.

however, the Alabama sturgeon was very rare, and had been found only in "portions of the [134-mile] length of the Alabama River channel below Millers Ferry Lock and Dam, downstream to the mouth of the Tombigbee River." *Id.* at 26440.  Millers Ferry Lock and Dam is in south Alabama, near Camden, Alabama.

     The final rule that is at issue in this action states, in part:

> Although unrestricted commercial harvesting of the Alabama sturgeon may have significantly reduced its numbers and initiated a population decline, the present curtailment of the Alabama sturgeon's range is the result of 100 years of cumulative impacts to the rivers of the Mobile River Basin (Basin) as they were developed for navigation, especially during the last 50 years.  Navigation development of the Basin affected the sturgeon in major ways.  This development significantly changed and modified extensive portions of river channel habitats, blocked long-distant movements, including migrations, and fragmented and isolated sturgeon populations.

*Id.* at 26440.  In other words, the marked decline in population size and range of the Alabama sturgeon is due to the synergistic effect of three agencies:  over-fishing; development of the rivers of the Mobile River Basin for navigation and power production; and water-quality degradation.  *Id.* at 26438, 26441.  Threats to the Alabama sturgeon are compounded by a lack of information on the species's habitat and life history requirements.  *Id.* at 26438.

     The final rule and other documents in the administrate record indicate "that the decision to list the Alabama sturgeon will not impact economic . . . activities, and that such activities do not threaten the fish."[8]  A 1999 news release from defendant Sam Hamilton, FWS's Regional Director, sums up the FWS's opinion of asserted threats to the economy based on the listing of the Alabama sturgeon:

> At the top of the list [of erroneous information regarding the effect of listing the Alabama sturgeon] is the concern that listing the sturgeon will stop current

---

[8]Doc. no.  45 (Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment), pp. 17-18 (citing doc. no. 19 (the administrative record), R-1 at 26450, 26458-61, R-39 at 3-4, R-41 at 1, R-49 at 1).

activities in the Alabama and Tombigbee rivers, including navigation channel maintenance dredging. Listing the sturgeon will *not* stop any of these activities, period. There are already four federally listed species in those rivers, one a sturgeon.[9] Additional of another will not change anything.

   . . .

Moreover, if one fish can wreck this region's economy, then the four aquatics species that are already on the list in those rivers should have wrecked it fourfold, a long time ago. It didn't happen, and it won't happen.

Doc. no. 19, R-41 at 1-2 (emphasis in original) (footnote added).

During an earlier listing process, economists at Troy State University submitted an analysis of the economic effect of listing the Alabama sturgeon. That economic impact analysis concluded that navigation of the Alabama and Tombigbee Rivers would be "impossible" if the Alabama sturgeon was listed as an endangered species. *Id.* R-39 at 3. FWS did not agree, as the final rule reflects:

Section 4(b)(2) of the Act does require us to consider economic or other impacts associated with the designation of critical habitat. However, we believe that the referenced economic impact analysis [prepared by economists at Troy State University] was based upon a set of incorrect assumptions about how the proposed listing would affect economic activity throughout the Mobile River Basin. The referenced analysis made no attempt to identify or quantify any past or present economic impact associated with 38 aquatic species currently listed throughout the Basin. For example, there are listed species associated with all of the navigation channels of the Mobile River Basin, yet no negative economic impact on navigation, ports, or marinas due to the presence of these species was documented in the economic analysis. The analysis assumes, however, without justification or examples, that all waterways within the Mobile River Basin will be closed to navigation by the designation of endangered status to the Alabama sturgeon, and estimates economic consequences that might result from a halt in all navigation in the Tennessee-Tombigbee, Tombigbee, Black Warrior, Mobile, and Alabama River channels, and the closing of ports and marinas. The Alabama sturgeon currently inhabits only the lower Alabama River. The Corps and the Service have determined

---

[9]The four aquatic species listed as threatened or endangered prior to the present controversy concerning the Alabama sturgeon are: the inflated heelsplitter, listed n 1990; the heavy pigtoe and souther combshell, listed in 1987; and the Gulf sturgeon, listed in 1991. Doc. no. 19, R-38.

that navigation maintenance has no adverse effect on the Alabama sturgeon. The proposed rule specifically stated that maintenance dredging is unlikely to result in a take of Alabama sturgeon. Therefore, navigation, ports, and marinas will be economically unaffected by this listing.

The economic analysis also assumed that water withdrawals and discharges within the Alabama, Coosa, Tallapoosa, Cahaba, Tombigbee, Black Warrior, and Mobile Rivers and their tributaries would be capped at present levels should the sturgeon be listed. As noted above, the Alabama sturgeon currently inhabits only the lower Alabama River. Water withdrawal has not been identified as a threat to the Alabama sturgeon. In addition, all of the rivers assumed to be impacted by the analysis, and many of their tributaries, currently support populations of endangered and threatened species that have been listed for many years, and yet the analysis documented no negative economic impact from water withdrawal and discharge capping due to the presence of these listed species.

64 Fed. Reg. at 26450.

## A.   Standing Facts

To support their assertions of Article III standing, plaintiffs have submitted four affidavits to demonstrate injury in fact caused by the listing of the Alabama sturgeon as an endangered species.

John D. Grogan, on behalf of Alabama Power Company, a member of the Alabama-Tombigbee Rivers Coalition ("the Coalition"), states that the decision to list the Alabama sturgeon "has caused direct, substantial, specific, and present injuries to Alabama Power, including the operations of its hydroelectric generating units . . . ."[10]   Specifically, he states that the listing provides the FWS and National Marine Fisheries Service ("NMFS") an "*opportunity* under the authority of the [ESA] to seek to change Alabama Power's operation of its hydroelectric generating units and management of its reservoirs[,] or subject such operations to adverse conditions."[11]   As support for this statement, Grogan refers the court to the motion to intervene in Alabama Power's

---

[10]Doc. no. 54, Exh. 1 ¶ 5.

[11]*Id.* ¶ 8 (emphasis added).

application to amend its license for the Holt Project on the Black Warrior-Tombigbee Waterway, which is near Tuscaloosa, Alabama, filed by the NMFS on June 1, 2000.  Grogan states:

> NMFS sought to force Alabama Power to expend significant resources to address the presence of the Alabama sturgeon, such as through the installation and construction of fish passage facilities and through implementation of adequate mitigation measures for the protection and enhancement of the habitat of the listed Alabama sturgeon.  NMFS specifically relied on its authority under the [ESA] in its Motion to Intervene.  Alabama Power expended substantial resources in responding to NMFS's motion to intervene.[12]

The NMFS filed a motion with the Federal Energy Regulation Commission seeking to intervene on the grounds that the affected waterway "supports populations of diadromous fishes[13] including Alabama shad (*Alosa alabamae*), striped bass (*Morone saxatilis*), American eel (*Angu[i]lla rostrata*), Gulf sturgeon (*Acipenser oxyrinchus desotoi*), and Alabama sturgeon (*Scaphirhynchus suttkusi*)," and that the affected waterway "provide[s] existing or potentially restorable habitats for these species, and are vital components of management strategies for these species."[14]  The motion to intervene sought to require consideration of "the impact of the proposed project and measures designed to alleviate these impacts."[15]  As authority for its right to intervene, NMFS cited "the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661-666," which "requires that NMFS be consulted when there is a proposal by a public or private agency under Federal permit or license to impound the waters of any stream or other body of water for any purpose."[16]  NMFS also

---

[12]*Id.* ¶ 7.

[13]"Diadromous fishes" are fish that migrate between salt and fresh water.  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY < http://www.m-w.com/cgi-bin/dictionary?va=diadromous>.

[14]Doc. no. 54, Exh 1., att. 1, pp. 2-3 (footnote added).

[15]*Id.* at 4.

[16]*Id.* at 5.  Section 662(a) of the Fish and Wildlife Coordination Act states:

[W]henever the waters of any stream or other body of water are proposed or authorized to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled

-11-

cited the ESA (16 U.S.C. §§ 1536, 1538) as support for its motion, as well as the Federal Power Act (16 U.S.C. § 803(a), (j)), the Anadromous Fish Conservation Act (16 U.S.C. § 757), Magnuson Fishery Conservation & Management Act (16 U.S.C. § 1801, *et seq.*), and the National Environmental Policy Act (42 U.S.C. § 4321, *et seq.*).[17] The record does not contain evidence to indicate whether the motion to intervene was granted.

Plaintiff Charles A. Haun, who is vice-president of plaintiff Parking Towing Company, submitted an affidavit in support of plaintiffs' standing.[18] Haun avers that the listing of the Alabama sturgeon as an endangered species has injured Parker Towing, which is a "full service marine transportation company operating a fleet of boats and barges which transport many types of dry commodities . . . on the rivers of Alabama."[19] He states:

> The listing of the Alabama sturgeon will delay, prevent, or create conditions and restrictions with respect to the issuance of necessary permits and authorizations for maintenance activities, such as some types of dredging (*i.e.*, more specifically the removal of rock ledges which present a danger to the safe operation of barges and boats), on waterways in Alabama used by Parker Towing. Even if navigation channel dredging will not be completely stopped, the delays caused and conditions created by the requirement to consult with FWS under Section 7 of the Endangered Species Act about Alabama sturgeon (for example obtaining a permit from the Army Corps of engineers) will cause significant adverse economic consequences for Parker Towing.[20]

---

or modified for any purpose whatever, including navigation and drainage, by any department or agency of the United States, or by any public or private agency under Federal permit or license, such department or agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, and with the head of the agency exercising administration over the wildlife resources of the particular State wherein the impoundment, diversion, or other control facility is to be constructed, with a view to the conservation of wildlife resources by preventing loss of and damage to such resources as well as providing for the development and improvement thereof in connection with such water-resource development.

[17]*Id.* at 5.

[18]Doc. no. 54, Exh. 2.

[19]*Id.* ¶ 2.

[20]*Id.* ¶ 6.

Haun also avers that changes in the locks and dams on Alabama rivers will interfere with Parker Towing's business, as well as his *personal*, recreational boating activities on the Warrior River.[21] Haun claims a "substantial personal interest in the biodiversity of [Alabama rivers] and the recovery of the Alabama sturgeon."[22]  He contends "[t]he FWS's decision to list the Alabama sturgeon as a separate species has caused direct, substantial, specific, and present injuries to me through elimination of the opportunity to recover the Alabama sturgeon by stocking the rivers in Alabama with shovelnose sturgeon which are currently found in abundance throughout the Mississippi River basin."[23]

Ralph O. Clemens, president of both the Coalition and Coosa-Alabama Rivers Improvement Association, asserts that "the listing of the Alabama sturgeon provides the FWS and/or [NMFS] the opportunity to intervene, require consultation, and otherwise participate under the authority of the [ESA] in various permitting and licensing issues involving members of the Coalition."[24]  He states:

> [T]he Coalition has been at the forefront of the recovery efforts for the Alabama sturgeon for over seven (7) years and has proven and [sic] on-going substantial interest in any actions which will impact the sturgeon's recovery, including FWS's decision to list the Alabama sturgeon as a separate species.  As a result of the listing, the Coalition's members are now forbidden by the ESA from participating in sturgeon repopulation efforts utilizing the shovelnose sturgeon currently found in abundance in the Mississippi River basin so long as the Alabama sturgeon remains listed as a separate endangered species.[25]

---

[21] *Id.* ¶¶ 3, 7.  The final rule states that the Alabama sturgeon has not been found in the Warrior River Basin for decades and that the only known area in which it has been found is in south Alabama.  64 Fed. Reg. 26440.

[22] *Id.* ¶ 4.

[23] *Id.*

[24] Doc. no.  54, Exh. 3 ¶ 4.

[25] *Id.* ¶ 8.

Richard J. Oates, Executive Director of the Alabama Pulp and Paper Council, a member of the Coalition, asserts that "the decision to list the Alabama sturgeon as an endangered species has caused direct, substantial, specific, and present injuries to the Council, the Coalition, and their members."[26] This injury arises from the "opportunity to intervene, [to] require consultation, and otherwise [to] participate" given to the FWS by the authority of the ESA.[27] As support for his claim of "direct, substantial, specific, and present" injury,[28] Oates refers the court to an incident of FWS intervention, prior to the listing of the Alabama sturgeon. He states, "even before the Alabama sturgeon was listed as endangered . . ., FWS commented on an application from Kimberly-Clark Corporation for a maintenance dredging permit for an existing dry dock slip, stating that the company's dredging activities could threaten various sturgeon species."[29] Specifically, the FWS's letter to the Army Corps of Engineers regarding the Kimberly-Clark dredging project, dated May 10, 1999, states:

> The Service does not object to this proposed project. However, the federally listed Gulf Sturgeon (*Acipenser oxyrinchus desotoi – Threatened*) and the proposed for listing, Alabama sturgeon (*Scaphirhynchus suttkusi*) are found in these waters. The Gulf sturgeon is an anadromous fish which migrates from salt water into large coastal rivers to spawn and spend the warm months. According to our records the Gulf sturgeon seasonally occurs and the Alabama sturgeon is a permanent resident within the Mobile River. Throughout their ranges these species have had their forage and spawning habitats adversely affected from dams. In additional, dredging . . . carried out in connection with channel improvement and maintenance represent an ongoing threat to these sturgeon species.
>
> In order to avoid adverse impacts to these species covered by the [ESA], we recommend that the applicant implement Best Management Practices (BMPs) including the use of turbidity screens, as necessary, to minimize turbidity

---

[26]Doc. no. 54, Exh. 4 ¶ 1.

[27]*Id.* ¶ 3.

[28]*Id.* ¶ 1.

[29]*Id.*

downstream of the project site. Dredging Activities should not exceed ambient water clarity of more than 50 Nephelometric turbidity units (NTUs). The Service believes that your project will not have an adverse effect on these sturgeon species, if these BMPs are followed. If these conditions are not acceptable then further consultation with this office is recommended in accordance with section 7 of the ESA.[30]

Plaintiffs have not, however, provided the court evidence indicating whether the proposed conditions were acceptable to Kimberly-Clark, whether the BMPs were implemented by Kimberly-Clark, or what, if any, direct and concrete harm this letter caused. Instead, Oates merely asserts: "The mere fact that consultation with FWS is now required by virtue of the listing of the Alabama sturgeon causes members of the Council and the Coalition injury in the form of planning expenses, costly studies, and project delays."[31]  Even assuming that assertion to be true, plaintiffs still have not submitted evidence of the "expenses, costly studies, and project delays" actually incurred by them, or other members of the Coalition, as a result of the listing of the Alabama sturgeon and/or consultation with the FWS.

### III. DISCUSSION

The determination of whether a plaintiff possesses standing to assert a claim must be made "by reference to the Art. III notion that federal courts may exercise power only 'in the last resort, and as a necessity,' and only when adjudication is 'consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process.'" *Allen v. Wright*, 468 U.S. 737, 752, 104 S. Ct. 3315, 3325, 82 L. Ed. 2d 556 (1984) (quoting *Flast v. Cohen*, 392 U.S. 83, 97, 88 S. Ct. 1942, 1951, 20 L. Ed. 2d 947 (1968); *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345, 12 S. Ct. 400, 402, 36 L. Ed. 176 (1892)).

---

[30]*Id.*, att. 1.

[31]*Id.* ¶ 4.

-15-

Plaintiffs, as the parties invoking federal jurisdiction, bear the burden of establishing standing. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103-04, 118 S. Ct. 1003, 1017, 140 L. Ed. 2d 210 (1998). Each plaintiff has the burden of establishing its (or his) standing with regard to each request for relief. *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 40, 96 S. Ct. 1917, 1925, 48 L. Ed. 2d 450 (1976) ("The standing question in this suit therefore turns upon whether any individual [plaintiff] has established an actual injury, or whether the [plaintiff organization has] established actual injury to any of their . . . members."). The measure of proof required to establish standing is determined by the stage of the proceedings. To demonstrate standing at the summary judgment stage, plaintiffs have the burden to produce evidence of an injury in fact, which will be taken as true for purposes of deciding the motion for summary judgment. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2137, 119 L. Ed. 2d 351 (1992).

The Supreme Court has said that a plaintiff must meet three requirements in order to establish Article III standing:

> First, [they] must demonstrate injury in fact — a harm that is both concrete and actual or imminent, not conjectural or hypothetical. Second, [they] must establish causation — a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant[s]. And third, [they] must demonstrate redressability – a substantial likelihood that the requested relief will remedy the alleged injury in fact. These requirements together constitute the irreducible constitutional minimum of standing, which is an essential and unchanging part of Article III's case-or-controversy requirement, and a key factor in dividing the power of government between the courts and the two political branches.

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 771, 120 S. Ct. 1858, 1861-62, 146 L. Ed. 2d 836 (2000) (citing *Lujan*, 504 U.S. at 560; *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990); *Simon*, 426 U.S. at 41, 45) (internal citations and quotation marks omitted).

The parties do not dispute that no plaintiff has been the subject of any direct action for civil or criminal penalties for "taking" an Alabama sturgeon in violation of Section 9 of the ESA. Therefore, because plaintiffs' alleged injuries have resulted from government regulation, not specific governmental action taken against them, their burden to prove standing is somewhat more difficult. The Supreme Court in *Lujan* held:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, *much more is needed*. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated . . . third party to the government action or inaction — and perhaps on the response of others as well. The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, and *it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.*

*Lujan* , 504 U.S. at 561-62 (citing *Simon*, 426 U.S. at 41-42, 44-45; *Warth v. Seldin*, 422 U.S. 490, 505, 95 S. Ct. 2197, 2208, 45 L. Ed. 2d 343 (1975); *Allen*, 468 U.S. at 758) (emphasis added).

To establish an injury in fact, plaintiffs must show that the injury is "concrete in both a qualitative and temporal sense. The complainant must allege an injury to himself that is distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical." *Whitmore*, 495 U.S. at 155, 110 S. Ct. at 1723 (internal citations and quotation marks omitted). "Some day intentions — without any description of concrete plans, or

-17-

indeed even any specification of when the some day will be — do not support a finding of the actual or imminent injury that [the Supreme Court's] cases require." *Lujan*, 504 U.S. at 564, 112 S. Ct. at 2138 (internal citations and quotation marks omitted).

To establish causation, plaintiffs must show a "fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant." *Vermont Agency of Natural Resources*, 529 U.S. at 771, 120 S. Ct. at 1861 (internal citations and quotation marks omitted). "Although the law of standing has been greatly changed in (recent) years, [the Supreme Court has] steadfastly adhered to the requirement that, at least in the absence of a statute expressly conferring standing, federal plaintiffs must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction." *Simon*, 426 U.S. at 41, 96 S. Ct. at 1925-26.

To establish redressability, plaintiffs must show "a substantial likelihood that the requested relief will remedy the alleged injury in fact." *Vermont Agency of Natural Resources*, 529 U.S. at 771, 120 S. Ct. at 1861-62 (internal citations and quotation marks omitted). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107, 118 S. Ct. at 1019.[32] "To the extent there is a difference [between causation and redressability], it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter

---

[32] "By the mere bringing of his suit, every plaintiff demonstrates his belief that a favorable judgment will make him happier. But although a suitor may derive great comfort and joy from the fact that the United States Treasury is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that *psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury.*" *Steel Co.*, 523 U.S. at 107, 118 S. Ct. at 1019 (emphasis added).

-18-

examines the causal connection between the alleged injury and the judicial relief requested. *Allen*, 468 U.S. at 753 n. 19, 104 S. Ct. at 3325 n.19.

In their complaint, plaintiffs allege that the listing of the Alabama sturgeon affects the Coalition's "vital economic interests in the river system in which the Alabama sturgeon is, or has been, or potentially will be, found and regulated."[33] Similarly, Parker Towing and Charles Haun contend that they have business interests that will be harmed by the listing of the Alabama sturgeon. Haun asserts that he has an interest in using the river system for recreational purposes that is adversely affected by the listing of the Alabama sturgeon. Plaintiffs contend that listing the Alabama sturgeon as an endangered species harms their interests in conserving the Alabama sturgeon by prohibiting breeding the shovelnose sturgeon with the Alabama sturgeon and/or stocking shovelnose sturgeon in Alabama rivers. They also contend that they are harmed by the requirement to consult with the FWS and/or NMFS regarding new or existing projects on Alabama rivers. Plaintiffs contend that these injuries or harms to their interests support a finding that they have Article III standing. They also argue that this court is bound by a prior decision of another judge of this court in a separate proceeding, based on allegations of wrongdoing during the rule-making process, that found that the Coalition had standing to seek preliminary injunctive relief based on the undisputed facts alleged in the complaint.

For the reasons set forth below, however, this court finds that a prior decision by another judge of this court on a separate, but related, matter does not preclude consideration of plaintiffs' standing in this case. Moreover, the court finds that evidence produced by plaintiffs is insufficient

---

[33]Doc. no. 1, ¶ 5.

to demonstrate that they have standing.  Therefore, for the reasons set forth below, the court finds

that the record does not support plaintiffs' claim that they have Article III standing.

## A.    Issue Preclusion

Plaintiffs contend "the issue of [their] standing to challenge FWS'[s] decision to list the

Alabama sturgeon as an endangered species has previously been resolved by *final* judgment entered

in litigation in this same Court between these very same parties. . . . Defendant did not appeal that

*final* decision, and so are collaterally estopped from relitigating that issue here."[34]

In support of their collateral estoppel argument, plaintiffs direct this court to the

memorandum opinion and preliminary injunction entered by another judge of this court in *Alabama-*

*Tombigbee Rivers Coalition v. Fish and Wildlife Service of the United States Department of the*

*Interior*, CV 93-AR-2322-S, docs. 11 & 12 (N.D. Ala. 1993).[35]  Plaintiffs do not cite the court to a

final or permanent injunction.

"Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit

involving the same parties or their privies based on the same cause of action.  Under the doctrine of

collateral estoppel, on the other hand, the second action is upon a different cause of action and the

*judgment* in the prior suit precludes relitigation of issues *actually litigated* and *necessary to the*

*outcome* of the first action."  *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327 n.5, 99 S.Ct.

645, 649 n. 5, 58 L. Ed. 2d 552 (1979) (citing, *inter alia*, 1B J. Moore, FEDERAL PRACTICE ¶

0.405[1], pp. 622-624 (2d ed. 1974)) (emphasis added).  "Collateral estoppel can foreclose

relitigation of an issue of fact or law where that *identical* issue has been fully litigated and decided

---

[34]Doc. no.  55 at 4 (emphasis added).

[35]*Id.* at  4-5; *see also* Doc. no.  54, Exh.5.

in a prior suit." *Grosz v. City of Miami Beach*, 82 F.3d 1005, 1006 (11th Cir.1996) (citing *I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1549 (11th Cir.1986)) (emphasis added).

"As a general rule, decisions on preliminary injunctions do not constitute law of the case and parties are free to litigate the merits." *William G. Wilcox, D.O., P.C. Employees' Defined Ben. Pension Trust v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989); *see also University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834, 68 L. Ed. 2d 175 (1981). Thus, the findings supporting a preliminary injunction generally would not support a claim of issue preclusion in a separate, subsequent proceeding.

Moreover, the issue of standing in this case is different from the consideration of standing in the prior case. "The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines." *United States v. Hays*, 515 U.S. 737, 742, 115 S. Ct. 2431, 2435, 132 L. Ed. 2d 635 (1995). Plaintiffs in this case seek relief from injuries caused by defendants' allegedly improper listing of the Alabama sturgeon as an endangered species; the prior action apparently concerned injuries from committee reports and committee meetings during the rule-making process in violation of the ESA. The actions of defendants at issue in these two proceedings are different; therefore, the issue of standing arising from injuries suffered because of these actions are different.

The court finds that the two proceedings did not involve identical issues; therefore, defendants' argument that plaintiffs lack Article III standing to challenge the listing of the Alabama sturgeon is not precluded by the preliminary injunction order and memorandum opinion in the prior case.

**B.      Merits of Plaintiffs' Article III  Standing**

Plaintiffs have provided four affidavits to demonstrate their Article III standing.  For the reasons set forth below, the court finds that this evidence is insufficient to establish a genuine issue of material fact as to whether the listing of the Alabama sturgeon as an endangered species caused plaintiffs personal, concrete injury, which is actual or imminent, that may be remedied by the requested relief.

**1.      Opportunity to intervene — harm to economic activities**

Plaintiffs, in their brief in support of their motion for summary judgment, state that the decision to list the Alabama sturgeon "will not impact economic or interstate activities," including navigation, maintenance dredging, and hydroelectric power production.[36]  Yet, plaintiffs contend that they have been injured, or injury is imminent, because the listing of the Alabama sturgeon provides the FWS and NMFS with the "opportunity to intervene . . . or otherwise participate under the authority of the [ESA] in various permitting and licensing issues involving members of the Coalition,"[37] which they allege will cause "planning expenses, costly studies, and project delays."[38]  Plaintiffs, however, have not presented any evidence of *actual* "planning expenses, costly studies, and project delays."  Given plaintiffs' recognition that the findings set forth in the final rule that the listing will not impact economic activities, plaintiffs' bare assertion that an "opportunity" for such

---

[36]Doc. no.  45 at 17-18 (citing R-1 at 26450, 26458, 26460;  R-39 at 3; R-41 at 1-2;  R-49 at 1).  Plaintiffs assert, "[T]hroughout the listing process and in the Final Rule, the Defendants admit in various ways that the decision to list the Alabama sturgeon will not impact economic or interstate activities, and that such activities do not threaten the fish . . . ." *Id.* at 17.

[37]Doc. no.  54, Exh. 3 ¶ 4; *see  id.* Exh. 1 ¶ 8, Exh. 4 ¶3.

[38]Doc. no.  54, Exh. 4 ¶ 4.

an impact exists is inadequate to establish an injury in fact fairly traceable to the listing of the Alabama sturgeon.

The court notes that businesses operating along Alabama waterways may be subject to consultation with, or "interference" from, Federal agencies under numerous environmental statutes, not just the ESA.  Also, the court notes that the Alabama sturgeon is not the only endangered or threatened species in these waterways.  It is simply not enough to establish constitutional standing for plaintiffs to argue that a business *may* have to consult with a federal agency, and *may* have to consider the environmental impacts of its proposed or intended actions (which were required before the listing, and which could be required even if the court found the listing of the Alabama sturgeon as an endangered species was void).  Plaintiffs must show that have real and concrete injuries, or the imminent threat of such injuries, fairly traceable to the listing of the sturgeon, *and*, that de-listing the sturgeon would remedy such injuries.  A bare assertion that plaintiffs have been injured because FWS or NMFS have another "opportunity" to interfere with their business operations is not sufficient to show a real and concrete injuries fairly traceable to the listing of the Alabama sturgeon as an endangered species.

Therefore, the court finds that the conjectural threat of the "opportunity" for economic injury because of the listing of the Alabama sturgeon is not sufficient to establish that plaintiffs have Article III standing for their claims based on the listing of the Alabama sturgeon as an endangered species.

2.    **NMFS's motion to intervene**

Plaintiffs, particularly Coalition member Alabama Power Company, contend that they have an injury in fact because "Alabama Power expended substantial resources in responding to NMFS's

motion to intervene" in the Power Company's application to the Federal Energy Regulatory Commission, seeking to amend its project license for the Holt Lock and Dam Hydroelectric Project. The court notes that there is evidence that the Alabama sturgeon does not exist in the waters surrounding the Holt Lock and Dam project.[39] Moreover, NMFS sought to intervene in this petition pursuant to the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661-666, which requires that the NMFS "be consulted when there is a proposal by a public or private agency under Federal permit or license to impound the waters of any stream or other body of water for any purpose."[40] NMFS lists numerous statutes, including the ESA, as additional statutory authority for its motion to intervene, but the Fish and Wildlife Coordination Act gave the NMFS authority to intervene in the Holt Lock and Dam application without reference to the Endangered Species Act. Also, the motion to intervene lists five species of diadromous fish (including the Alabama sturgeon) for which the waters surrounding the Holt dam project are "existing or potentially restorable habitats . . . and are vital components of management strategies."[41] Of these five fish, the Alabama sturgeon, the Gulf sturgeon, and the Alabama shad are threatened or endangered species.

The court finds that any injury based on costs expended by the Alabama Power Company to oppose NMFS's motion to intervene are not fairly traceable to the listing of the Alabama sturgeon as an endangered species, and, will not be remedied by a judgment in favor of the plaintiffs declaring the listing of the Alabama sturgeon unlawful and void. Clearly, NMFS's right to intervene is conferred by statutory authority other than the Endangered Species Act, the Alabama sturgeon is not the only endangered species on NMFS's list, and there is no evidence that any modification to

---

[39] 65 Fed. Reg. 26440; Doc. no. 19, R-39.

[40] Doc. no. 54, Exh. 1, att. 1 at 5.

[41] *Id.* at 3.

Alabama Power Company's application will be compelled by NMFS based on the listing of the Alabama sturgeon, which has not been found in the waters around Holt Lock and Dam.  Any order finding that the listing of the Alabama sturgeon as an endangered species is "unlawful and void of any force and effect" would not prevent NMFS from intervening, or moving to intervene, in any application for a "permit or license to impound the waters of any stream or other body of water for any purpose,"[42] just as it did in Alabama Power's Holt Dam proceedings.  In short, the authority of the NMFS to intervene in the Holt Lock and Dam application is established by statutes independent of the Endangered Species Act, and it is not dependent on the listing of the Alabama sturgeon.

Therefore, the court finds that the Coalition does not have standing based on an alleged injury resulting from the defense costs incurred by a Coalition member, and resulting from the NMFS's motion to intervene in the Holt Dam application, because the Coalition has not shown either that the costs of opposing the NMFS motion to intervene are "fairly traceable" to the listing of the Alabama sturgeon, or that such "injury" is redressable by a favorable decision of this court.

3.      **Kimberly-Clark dredging activities**

Plaintiffs contend that, based on FWS consultation with Kimberly-Clark regarding dredging activities, the FWS will interfere with the operations of the members of the Coalition.  Richard J. Oates, Executive Director of Alabama Paper & Pulp Council, another member of the Coalition,

---

[42]16 U.S.C. § 662(a); *see also* 16 U.S.C. 803(j).  The Federal Power Act,  16 U.S.C. § 803(j)(1), provides:

(1) That in order to adequately and equitably protect, mitigate damages to, and enhance, fish and wildlife (including related spawning grounds and habitat) affected by the development, operation, and management of the project, *each license issued under this subchapter shall include conditions for such protection, mitigation, and enhancement.*  Subject to paragraph (2), *such conditions shall be based on recommendations received pursuant to the Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.) [16 U.S.C.A. § 661 et seq.] from the National Marine Fisheries Service*, the United States Fish and Wildlife Service, and State fish and wildlife agencies.

16. U.S.C. § 803(j)(emphasis added).

-25-

states: "The mere fact that consultation with FWS is now required by virtue of the listing of the Alabama sturgeon causes members of the . . . Coalition injury in the form of planning expenses, costly studies, and project delays." *Id.* ¶ 4.

As stated above, plaintiffs acknowledge that, during the listing process and in the final rule, defendants found that the listing of the Alabama sturgeon would not impact navigation and channel maintenance. Moreover, in light of the undisputed finding that the listing of the Alabama sturgeon would not interfere with channel maintenance dredging, the court fails to see how FWS's "interference" with dredging activities prior to the final rule listing the sturgeon supports a reasonable inference that (1) FWS has or will, imminently, interfere with a Coalition member after the final rule, and (2) such interference is (or will be) fairly traceable to the listing of the Alabama sturgeon. The FWS letter regarding the Kimberly Clark dredging situation specifically notes that, in addition to the Alabama sturgeon (a proposed listing), the Gulf Sturgeon, a threatened species, was found in the waters covered by Kimberly-Clark's application. Moreover, nothing in the record supports a reasonable inference that de-listing the Alabama sturgeon would remedy or prevent "interference" by FWS or NMFS, especially in light of the existence of endangered or threatened species in the same waters and clear statutory authority authorizing such "interference" without reference to the existence of a listed, endangered species.

### 4. Stocking and breeding Mississippi shovelnose sturgeons

Plaintiffs contend that their conservation efforts with regard to the Alabama sturgeon have been adversely affected by the listing of the Alabama sturgeon as a separate species from the Mississippi shovelnose sturgeon. They contend:

-26-

> Among the purposes of the Coalition are to participate in the development, funding, and implementation of Conservation Agreements . . . such as the Alabama Sturgeon Conservation Agreement which was signed by the Coalition on February 9, 2000. One *possible* recovery measure for the Alabama sturgeon includes repopulation of Alabama waters by breeding and stocking with shovelnose sturgeon which are currently abundant in the Mississippi River basin. . . .   The Coalition cannot participate in such repopulation efforts utilizing shovelnose sturgeon as long as the Alabama sturgeon is listed as a separate endangered species.[43]

However, plaintiffs have offered no evidence demonstrating that they actually planned or intended to stock and/or breed the shovelnose sturgeon in Alabama waters. Rather, this particular form of repopulation is no more than a hypothetical "recovery measure." As such, the prohibition of such a hypothetical recovery measure, with no evidence that plaintiffs intended or planned to implement such a measure, in not an injury in fact. "Some day intentions — without any description of concrete plans, or indeed even any specification of when the some day will be — do not support a finding of the actual or imminent injury that [the Supreme Court's] cases require." *Lujan*, 504 U.S. at 564, 112 S. Ct. at 2138 (internal citations and quotation marks omitted).

Therefore, plaintiffs do not have standing based on the prohibition of a "possible" recovery measure, without evidence to indicate that the recovery measure was intended or planned.

### 5.    Recreational Boating

Plaintiff Charles A. Haun contends that "[c]hanges in the operation or physical design of dams and their associated lock facilities [along rivers within the historic range of the Alabama sturgeon] which alter the flow of the rivers will interfere with [his] recreational boating activities."[44] Haun's affidavit fails to indicate that such changes have occurred, or that they are imminent, much less that these future changes would harm his boating activities, the details of which are not apparent

---

[43]Doc. no. 54, Exh. 1 ¶ 7 (emphasis added); *see id.*, Exh. 2 ¶ 4;  *id.*, Exh. 3 ¶ 8.

[44]Doc. no. 54, Exh. 2 ¶ 3.

from his affidavit.[45]  Plaintiffs note that, during the rule-making process, fishing and recreational activities were not impacted by the decision to list the Alabama sturgeon.  Doc. no. 45, pp. 17-18 (citing R-39 at 4).  No evidence has been offered that changes to locks and dams because of the listing of the Alabama sturgeon have occurred, or that changes are imminent.

The court finds that Haun's alleged injury based on some future "interference" with his recreational boating activities to be caused by changes in unidentified locks and dams brought about by the listing of the Alabama sturgeon as an endangered species is insufficient to establish that he has suffered an injury in fact, or that such an injury is imminent from the listing of the Alabama sturgeon.

Because plaintiffs have failed to demonstrate Article III standing, their claims against defendants are due to be dismissed.

## IV. CONCLUSION

For all of the foregoing reasons, plaintiffs' motion for summary judgment (doc. 44) is due to denied, and defendants' motion for summary judgment (doc. 49) is due to be granted.  An appropriate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this _30th_ day of July, 2002.

_____

United States District Judge

---

[45]*Id.*  Haun states: "I have personally used various rivers in Alabama, which . . . are within the historic range of the Alabama sturgeon, for recreational boating.  I intend to continue to do so in the future.  Changes in the operation or physical design of dams and their associated lock facilities which alter the flow of the rivers will interfere with my recreational boating activities."  *Id.*